*665 OPINION OF THE COURT
Donald J. Corbett, Jr., J.
This cause of action arose on January 19,1994, and the claim herein was filed on November 2, 1995, pursuant to my order in Motion No. M-52289 granting claimants permission to file a late claim. For syntactical ease, unless otherwise specified, I will use the term claimant to refer only to Patricia Tuchrello.
Claimant was injured in a one car accident when the vehicle she was driving went out of control on the “flyover” portion of State Route 390 at its intersection with State Route 590, struck and vaulted over the Jersey barrier side rail, and fell some 60 or more feet to the ground below. The “flyover” traversed over two other highways.
The claim asserts liability by the State of New York on numerous grounds (see para 4 [A-J] of the claim), but allegations, inter alia, that the defendant was negligent in the design and construction of the highway, apparently were abandoned, as no evidence thereof was offered. Allegations relating to negligent repair, or the failure to properly sign the area during winter driving periods similarly were bypassed. Claimant predicates liability primarily on grounds that:
“(1) The State was negligent in its snow and ice removal operations in that it failed to reasonably and adequately maintain the barrier on the flyover;
“(2) that the snow and ice removal operations critically reduced the effectiveness of the safety barrier to the extent of making it incapable of providing reasonable protection for highway users;
“(3) that it created and/or permitted and allowed and/or failed to remedy a dangerous condition to exist and remain on the bridge in the form of accumulated snow, introducing the potential for vehicular vaulting, and
“(4) that the snow and ice removal plan was inherently unreasonable or lacked any reasonable or rational basis.”
Claimant contends that the State affirmatively compromised or destroyed the sole safety feature of the barrier, to prevent vehicles from leaving the surface, thereby creating a dangerous condition. Since the above represent the essential allegations of negligence, I have focused on the proof and law as they relate to each ground. The trial of this matter was bifurcated and this decision considers only the issues of liability.
*666 In Monroe County, State Route 590 forms a portion of the eastern Rochester “Outer Loop” which generally runs in an east-west direction at its intersection with State Route 390, known as the Genesee Expressway, which runs generally in a north-south direction. Where these routes intersect, Route 390 forms an upward ramp and then bridges and crosses over Route 590.[1]
The road surface on the “flyover bridge” was concrete with two 12-foot wide lanes of one-way, same-direction, traffic. The sides were Jersey barrier construction of 36-inch high concrete, the purpose of which was to keep vehicles from going off the bridge. Thus traveling south on Route 390, the shoulder on the left (east) was 6 feet wide, and the right (or west) shoulder was 12 feet wide. The right shoulder is pitched away (reverse elevated) from the two travel lanes to prevent water from going across the travel lanes. The roadway itself is super-elevated with the high side on the right (west), to the low side on the left (east), and the pavement has a grooved surface to drain water off the road. This “390/590” road with the flyover bridge was completed in 1981 and has what may be characterized as a unique design.
On January 19, 1994, at approximately 7:20 a.m., claimant was operating her motor vehicle (a 1988 Jeep owned by her husband) in a southerly direction on the Route 390 ramp, having just exited from Route 590 south. She was in the lefthand (eastern-most) lane of traffic. The roadway was “dry, with a lot of dry salt on it,” and had light traffic as claimant entered the ramp with snow piled along both sides of the road barriers on both shoulders. The wind was strong and gusting at times. When she reached the portion of the ramp where it curves left and is elevated, claimant testified:
“I believe I hit a patch of black ice or some kind of ice. I lost control of the vehicle and I tried to bring it back into control and as I did I believe I hit more ice and I spun around and did 360’s in the middle ' of the ramp and started coming down it the wrong way. And then I drove into the wall and shot off * * * ”
With her vehicle spinning out of control, she approached and struck the left (east) Jersey barrier in a straight-on direction, went airborne over the wall, and fell to the ground below. She *667 was traveling with other traffic and was operating at a speed of approximately 30 to 35 miles per hour. She was wearing her lap and shoulder seat belt.
The month of January 1994 was the second coldest month in 100 years in Rochester, and the wettest month in 15 years. The weather produced below zero degree temperatures, including the all-time record low .of -17 degrees Fahrenheit on January 16th. As one forecast stated, “The month of January, 1994 brought brutal conditions to New York State and specifically the Rochester area.”[2]
In 1993, the New York State Department of Transportation (DOT) implemented new Highway Maintenance Guidelines (exhibit I). In preparation for snow and ice control for the coming winter season, each DOT region must annually submit its plan, with manpower requirements, to the central office of DOT in Albany for review and funding.
Thus at the time of this accident, and consistent with its then recently implemented highway maintenance guidelines, it was the practice of DOT in removing snow and ice from this bridge to plow the snow from the road surface and pack it against the sides of the bridge. The DOT made the specific determination not to plow, blow or push the snow off this bridge, because there were two other highways underneath (see n 1, supra). However, there were two dangerous conditions, which, if they existed, would mandate[3] the removal of accumulated snow from bridge rail or barrier:
“(1) if the ‘stored snow could possibly melt and drain across the traveled way,’ or
“(2) if ‘the area [was] so full of snow that it could not accommodate future snow.’ ”
Evidence at trial failed to establish that either of the two dangerous conditions mandating snow removal from the bridge rail or barrier existed at the time of the accident in question, and thus the removal of accumulated snow was not mandated by the guidelines. Specifically I find that the melted snow (water) concern did not exist in the 390/590 area of this accident as the traveled surface of the roadway was channeled with grooving and the shoulders were also channeled. I also find *668 that the snow storage concern did not exist, as the shoulders were two thirds to three quarters snow free and there were between 12 and 18 inches of plowed snow in the shoulder area against the left (36-inch high) barrier over which claimant’s vehicle vaulted.
The height of the plowed snow against the barrier arises as a factual dispute requiring judicial determination. My finding diminishes the facial appeal of some of claimant’s arguments. Specifically, claimant has urged that the record supports a finding that there were approximately 24 inches of snow accumulated against the left or east barrier, which is acknowledged to be some 36 inches in height. Thus claimant suggests that this accumulation, two thirds of the height of the barrier, leads to and accentuates the ramping risk, and indeed, putatively permitted the ramping or vaulting of the flyover here. Anthony Turazzo, a plowing supervisor for DOT in the Rush residency (an area which incorporates the flyover in question) during 1994, testified credibly and was persuasive in his observation of the height of the snow against the barrier. Turazzo had been advised of the accident by one of his subordinates and went to the scene shortly after it occurred. He saw the claimant’s vehicle below the bridge. He observed that the road was dry, that there was accumulated salt on the main road surface, that two thirds to three quarters of both shoulders were snow free, and that the snow was packed up at the barrier at a height of about 12 to 18 inches. While acknowledging that Turazzo is an employee of the defendant and thus subject to insinuations of partiality, I find his assessment, made somewhat contemporaneously with the accident, to be fully credible and consistent with my review of the record. That being said, the height of the snow is proportionately and measurably less steep and less provocative than the 24-inch height urged by claimant, as this calculation measures the slope at only one third to one half the height of the barrier, rather than two thirds as proposed by claimant. This finding diminishes the argument that the residual snow created an inherently dangerous ramp, putatively positioned to vault vehicles over the bridge. While there is no exact height at which I determine that there was such a vaulting likelihood that liability would attach, claimant’s attempt to embellish that height and thus overstate the ramping potential is rejected.
Turazzo’s testimony was compelling as well because he found the road to be clear and dry, and he purposely declined to direct any additional plowing runs after viewing the scene of the *669 accident.[4] Turazzo had been with DOT since 1982, and a bridge repair supervisor since 1986. During the winter he was supervisor of snow and ice, in particular during 1994, and had 12 people working for him with four trucks with nose plows and double wing plows, one of which was a 10-wheel truck. The trucks were equipped with salt and sand spreaders. Routes 390 and 590 in Rochester were his responsibility with the trucks assigned to usual duties. On the date of the accident, there had been snow falling earlier in the shift and the plows went out, and then the snow stopped. The normal shift is midnight to 8:00 a.m., but the drivers were subject to call at any time. As noted above, he saw the snow packed up at the barrier and two thirds to three quarters of both shoulders were snow free, thus no plowing was ordered.
I find that the number of plowing runs and salt/sand applications on the flyover bridge, and the resources available and utilized, were more than reasonable under the circumstances. At the time of the accident I find that the traveled road surface was dry and did not contain ice at the location where claimant lost control of her vehicle. Furthermore, these facts would tend to negate any theory that the circumstances in question constituted a “storm in progress.” The issues of a “storm in progress” defense would be applicable in the weather conditions of January 19th and the prior days, but the plan for ice and snow control in the residency did not call for the removal of the plowed snow on the curve of this flyover bridge, except for the “mandated” circumstances not existent here. In any event, this defense is not applicable.
In support of her claim claimant offered the testimony of Lawrence Levine, a certified engineer, and an experienced forensic expert witness. Mr. Levine expressed his expert opinion supporting several theories of liability. Initially, it was his opinion that the State must keep the shoulders clear of snow at all times, and that the failure to remove the snow creates a ramp which would permit a vehicle when approaching the rail to ramp up and over the barrier, and thus the snow should have been cleared. He also avers that the removal of all snow from against the concrete barrier is an absolute standard and that there is no reason not to remove all accumulated plowed snow. While this may be a supportable opinion, it must be *670 tempered by the reality of providing a reasonable period of time, in this particular high rise bridge, for the removal of accumulated plowed snow, and the exigency of the need.
His opinions also must be contrasted with the DOT’s 1993 Highway Maintenance Guidelines governing this circumstance. The DOT guidelines (exhibit I) address, in relevant part:
“5.1000 — Preparation for Snow and Ice Control “5.1100 Objective— * * * have sufficient resources and knowledge to effectively combat snow and ice conditions that routinely affect the State highway system, in accordance with budgetary and available resource considerations.
“5.1200 Goal— * * * provide a reasonable response to snow and ice events that affect the State highway [s]. * * *
“5.3304 — Plowing of Shoulders — After the pavement and ramps are cleared, the full width of the shoulders should be plowed. If weather predictions indicate that snow on the shoulders will not freeze solid, shoulder plowing may be delayed until it can be accomplished on a ‘Regular Time’ basis. It is particularly important that snow be cleared beyond the shoulder high point on banked curves in order to minimize possible refreeze of snow melt on the pavement. * * *
“5.3306 — Plowing Back and Benching — After the storm is over, plowed snow should be plowed back as far as possible to provide snow storage space in anticipation of the next storm * * *
“5.3307 Removal of Snow from Special Areas—
“A. General — After the storm is over, the shoulders * * * have been plowed and * * * pushing back operations are * * * complete, removal of snow from special areas should commence * * *
“B. Bridges — When possible, accumulated snow should be removed from locations that could melt during the day, drain across the deck, and freeze at night. Bridge drainage features should be cleared to facilitate the designed discharge of water. Also, bridges having features to prevent plowed snow from leaving the bridge should have the accumulated snow removed to make room for the next storm. * * *
*671 “D. Banked Curves — When possible, accumulated snow on the high side of banked curves should be removed to minimize the risk of melt water freezing on the pavement.” (Emphasis added.)
In reviewing claimant’s theories of liability, I have already found that the piling of snow against the barriers, at the level of accumulations which then and there existed, did not constitute a dangerous condition. The unrefuted testimony of David Goehring on defendant’s behalf revealed an accident history of no similar accidents of any nature for southbound traffic on this high rise bridge for the three year period ending on January 1, 1994 (19 days prior to the accident here). The traffic counts were estimated at some 17,700 vehicles per day, with a range from 694 to 1,630 vehicles per hour between 6:00 a.m. and 8:00 a.m. during January of 1994. Accordingly, there is no accident history that would have placed the defendant on actual or constructive notice of a dangerous condition on this high rise bridge.
Additionally, the evidence does not support a theory that there was a potential for vaulting. I have found that the snow and ice removal operations did not reduce the effectiveness of the safety barrier. The defendant’s snow and ice removal procedures here were completed in accordance with the aforementioned guidelines.
It is well established that the State has a nondelegable duty to properly design, construct and maintain its roadways in a condition which is reasonably safe for those who use them (see, Friedman v State of New York, 67 NY2d 271; Weiss v Fote, 7 NY2d 579). The State, however, is not an insurer of the safety of its roadways and the mere happening of an accident does not render the State liable (see, Tomassi v Town of Union, 46 NY2d 91; Brooks v New York State Thruway Auth., 73 AD2d 767, affd 51 NY2d 892). Generally, liability will not attach unless the State had either actual or constructive notice of a dangerous condition and then failed to take reasonable measures to correct the condition (see, Brooks v New York State Thruway Auth., supra; Rinaldi v State of New York, 49 AD2d 361, 363).
Beyond that, the State is accorded a qualified immunity from liability arising out of a highway planning decision and can only be found liable for injuries “arising out of the operation of a duly executed highway safety plan * * * predicated on proof that the plan either was evolved without adequate study or lacked reasonable basis.” (Weiss v Fote, supra at 589; Friedman v State of New York, supra.)
*672 Not surprisingly, claimant challenges the adequacy of the planning which led to the promulgation of the 1993 Highway Maintenance Guidelines. Claimant argues that the guidelines themselves, specifically the snow and ice removal plan, were inherently unreasonable, inadequate and were formulated without the requisite degree of planning. Challenges to such planning decisions, and the State’s demurral and reliance upon the immunity doctrine as set forth in Weiss v Fote (supra), are frequently litigated in this court.
It is instructive to review the evidence before me with respect to the guidelines. In 1991, the Maintenance Director for the New York State Department of Transportation determined that the then current guidelines for snow and ice removal should be reviewed. He appointed a committee from around the State to conduct a review and make recommendations. A final draft was produced and submitted to various state agencies for comment. The final guidelines were adopted in 1993 and they superceded all previous guidelines.[5] At the time of this accident, they had been recently promulgated, and indeed the adequacy of the planning that went into their preparation, as discussed below, is the subject of claimant’s scrutiny. In any event, one of the guidelines provides that the removal of snow from the traffic side of guiderail and median barriers was found to be “not possible with available resources.”[6]
The promulgation of the 1993 guidelines resulted from a two-year planning process, with the reasoned input from experts in the field in New York State. The guidelines recognized the reality of budgetary constraints and the limitation of resources, and cover some 7,800 bridges on State highways, with 604 miles of bridge rail or barrier and some 4,300 miles of nonbridge rail or barrier. Even in a world of unlimited resources, the reality is that snow falls and ice forms at its own schedule, and the roadways cannot be instantaneously cleaned at a single moment in time. I am cognizant of claimant’s expert opinion that the concrete barrier can act as a snow fence on which snow accumulates across the lee side of the barrier onto the roadway surface, and that this structure is a purportedly known situation which calls for fast planned special action or special needs in winter conditions. While I might concur that on this high rise bridge accumulated plowed snow should be removed in a reasonable period of time, the is *673 sue here is not any unwarranted delay in removal, but a theory that seemingly would require almost immediate removal.
The opinion of claimant’s expert, that the removal of all snow from against the concrete barrier is an absolute standard and that there is no reason not to remove all accumulated plowed snow, fails to incorporate the realities of snow removal in wintry climes. I am persuaded that the defendant’s specific guidelines, which do not mandate removal unless there was melting snow creating a dangerous condition, or if there was insufficient room for the next snowstorm, was reasonably calculated to address dangerous conditions in special areas such as this type of bridge. This is the very type of study and decisions made by DOT, including the allocation of resources, that the Court of Appeals recognized in Friedman v State of New York (67 NY2d 271, 285-286):
“Strong policy considerations underpin the qualified immunity doctrine set forth in Weiss (supra), and, in cases such as these where a governmental body has invoked the expertise of qualified employees, the Weiss directive should not be lightly discounted * * * for to do so * * * ‘would constitute the type of judgment substitution that Weiss v Fote (supra) prohibits’ * * *
“[Wjhen a municipality studies a dangerous condition and determines as part of a reasonable plan of governmental services that certain steps need not be taken, that decision may not form the basis of liability.” (Citations omitted.)
Ascertaining the reasonableness and adequacy of the State’s planning is quite frankly a subjective assessment, not reduced to simplistic mathematical formulae. Indeed the defendant presented the testimony of Duane Amsler, who was the DOT project coordinator for the development of the new guidelines, and whose testimony was comprehensive and persuasive, particularly with respect to the deliberative process utilized in the formulation of the new guidelines. I assess the credibility of this testimony with the full awareness that the guidelines were prepared by the defendant, that it utilized, inter alia, its employees for that purpose, and thus it can easily present witnesses whose testimony may cynically be viewed as self-serving. Nonetheless, viewed with a jaundiced eye, I find that the reviews, studies, analysis and consideration of the minuscule potentiality of vaulting accidents, and the practical limitation of removing all plowed snow from the barriers due *674 to limited resources, demonstrate that the State has invoked reasoned plans and procedures to guide its employees in snow removal, and “something more than a mere choice between conflicting opinions of experts is required before the State or one of its subdivisions may be charged with a failure to discharge its duty to plan highways for the safety of the traveling public” (Weiss v Fote, supra at 588). In so finding, I must reiterate that there was no dangerous condition in existence at the time and place of this accident. I find that the State is entitled to the qualified immunity from liability arising out of highway planning decisions that require expert judgment or the exercise of discretion (Friedman v State of New York, supra; Weiss v Fote, supra). I make this finding with the understanding that Weiss does not provide unlimited immunity, and that if the shoulder became close to full of snow, then immediate, drastic measures would have to be taken to remove the snow. In sum, however, the Weiss immunities do apply to snow and ice control decisions by DOT, and I find that the decisions made, including the priority of the allocation of resources, were reasonable.
Gomez v New York State Thruway Auth. (73 NY2d 724), although superficially a close question, is not to the contrary. As noted by the defendant, the trial decision (McMahon, J., Dec. 30, 1986, Claim No. 69823) provides an insightful picture of the ultimate affirmance by the Court of Appeals. In Gomez, liability was predicated upon the Thruway’s failure to remove a snowbank adjacent to the guiderail.[7] This would overtly apply to the claim at bar, but the distinctions abound. First, Judge McMahon had evidence before him that the snowbank there had been covering and obstructing the “rail” for about seven days prior to the accident, but more to the point, it was undisputed that the Thruway had “adequate equipment, personnel and resources to remove the snowbank, but apparently simply determined not to do so.” The defendant here has contested the sufficiency of its equipment, personnel and resources to remove the snow, let alone the lesser quantity of snow and the visibility of at least half of the Jersey barrier, and the absence of testimony regarding the period of time that the plowed snow existed. Second, perhaps more significantly, the Thruway did not offer or rely upon the guidelines governing ice and snow removal, as the State has in the instant claim. *675 Indeed, the guidelines in question (exhibit I) were drafted with an awareness and knowledge of Gomez and apparently the only other known “vaulting” incident (see partial trial transcript, testimony of Duane Amsler, at 22-24). Given the fact that the roads were clear and dry, with the shoulders adequately cleared of snow, with adequate room for a putative next snowfall (in compliance with existing guidelines), and the absence of proof that the “snowbank significantly reduced the effectiveness of the guiderail,” the findings in Gomez are not sufficiently comparable. Moreover, the flyover bridge in question here was designed with a wider shoulder than previous designs to accommodate snow storage (see Amsler transcript, at 15-17, 60). Finally it appears that, since the trial court was not examining applicable guidelines, a Weiss v Fote defense and any qualified immunity related thereto were not considered.
Given the result above, in the absence of negligence by the defendant, it is not necessary for me to make any determination with respect to any alleged culpable conduct of the claimant with respect to the speed of her vehicle.
The claim is dismissed. All motions not heretofore ruled upon are now denied.

. At this location the elevated Route 390 actually passes over two other highways, Route 390 north and Route 590 south.

. See exhibits 16,17,17a, F.

. The Highway Maintenance Guidelines of course are guidelines and not mandates, and consideration must be given to the attendant circumstances as no two situations are identical (Skehan v State of New York, NeMoyer, J., Aug. 15, 1996, Claim No. 72827).

. These observations were similarly, and credibly, corroborated by Richard McKelvey, a DOT truck driver, who saw the car and returned to the bridge, where he saw that the roadbed was clear of snow, dry and had salt deposits upon the road surface.

. See exhibit I.

. Exhibit I, § 5.3307 (I).

. It is always interesting to note, despite the essentially interchangeable nomenclature between guiderail and guardrail, that claimants utilize the term guardrail, and that State defendants use the term guiderail. It appears that each party believes its terminology invokes a more favorable connotation.