OPINION OF THE COURT
 

 Alexander, J.
 

 In each of these personal injury actions arising out of "crossover” accidents occurring on highways constructed and maintained by the State of New York in which a vehicle crossed the median dividing opposing lanes of traffic, a common issue is presented: whether the State breached its duty to alleviate a known hazardous highway condition. The alleged negligence in each case was the State’s failure to install median barriers at the accident site. The facts in each case are as follows.
 

 Friedman v State of New York
 

 On March 15, 1978, at about 5:00 p.m., claimant Dena Friedman was driving in an easterly direction across the Roslyn Viaduct, an elevated portion of Northern Boulevard (State Route 25A) located in Nassau County. The viaduct had two lanes of traffic in each direction separated by a median traffic divider that was 8 inches high and 46 inches wide. While Friedman was in the left lane next to the median, her car was struck by a vehicle that cut her off while attempting to pass. The collision caused Friedman’s car to swerve to the left and cross the median. As it continued across the two westbound lanes, the car was struck in the side by a westbound vehicle and hit a 21-inch-high pedestrian curb the angled top of which acted as a ramp, propelling the car over the 3-foot-wide walkway and a 39-inch guardrail into a 50-foot-deep ravine.
 

 Friedman suffered severe personal injuries. She commenced this action against the State charging the State’s negligent failure to install a median barrier and safe guardrails on the viaduct.
 

 Following trial, the Court of Claims found that as early as February 1973 the New York State Department of Transportation’s (DOT) Traffic and Safety Division (Region 10) had recognized, based on a proliferation of crossover accidents, two
 
 *279
 
 of which involved fatalities, that a median barrier was necessary on the viaduct. From that point on, DOT’S employees, including safety, maintenance, traffic and design engineers, submitted numerous requests and recommendations that median barriers be installed.
 

 A DOT "Project Proposal and Evaluation” dated August 2, 1974 estimated that a general rehabilitative project on the viaduct, including grading, paving, drainage, lighting and installation of concrete median barriers, could be completed in 18 months. The State’s expert testified that if the project had been a priority, construction could have been started within three or four years. The expert conceded that temporary barriers could have been installed in the interim.
 

 Nevertheless, at the time of the accident in 1978, construction on the proposed viaduct project had not yet begun and temporary barriers had not been installed. Two factors put forth by the State at trial as contributing to the delay were (1) that the project’s scope and cost had been expanded repeatedly to encompass many additional items including repairs to bridge abutments and approach pavement, a variety of cleaning, painting and resurfacing jobs on the viaduct, and repairs on a
 
 lVz
 
 mile stretch of Northern Boulevard and a Long Island Railroad Bridge, and (2) that a request for funding submitted to DOT’s Capital Project Section by Region 10 had been rejected because of inadequate documentation.
 

 The State’s expert also testified that the project had not been given priority because a greater number of fatal accidents had been occurring on the entire length of several major highways in Nassau and Suffolk Counties than on the 2,000-foot Roslyn Viaduct. No evidence was adduced, however, as to the number of crossover accidents on those highways or whether a large proportion of the accidents had been occurring on relatively short stretches thereof. Nor was any evidence proffered as to other projects that had been given priority over the Roslyn Viaduct project.
 

 The Court of Claims determined that the State and claimant each were 50% liable for claimant’s injuries, and ordered a trial to assess damages. The court rejected the State’s governmental immunity argument, which was based on its assertion that it had, in good faith, set priorities for the use of availablé funds, holding that the evidence did not establish that priorities had ever been set.
 

 On cross appeals, the Appellate Division affirmed the inter
 
 *280
 
 locutory judgment. The court held that the governmental immunity doctrine enunciated in
 
 Weiss v Fote
 
 (7 NY2d 579) was inapplicable since the State’s own experts had recommended that barriers be installed immediately on the viaduct and the State failed to show that the delay in remedying the known hazardous condition resulted from a discretionary decision concerning funding priorities (111 AD2d 921). The appeal is now before this court on a certified question of law.
 

 Cataldo v New York State Thruway Auth.
 

 At 3:30 p.m. on January 26, 1973, Connie Flachs Cataldo was traveling west across the Tappan Zee Bridge. The bridge, which was opened in 1955 as part of the New York State Thruway, spans the Hudson River between Nyack in Rock-land County and Tarrytown in Westchester County. It is approximately 3 miles long and consists of two 37-foot-wide roadways in each direction separated by a raised 10-foot-wide median with a sloped 3-inch curb. Each roadway carries three lanes of traffic with no shoulder area.
 

 The bridge can be divided roughly into three sections. From its west abutment it runs in a curve for approximately 3,100 feet. A straight, or tangent, section then stretches for approximately two miles. The span again curves at its east end. When it was constructed, the bridge contained no median barriers. In 1962, however, a 27-inch-high corrugated metal beam median barrier was installed along the curve at the west end.
 

 On the day in question, Cataldo was driving on the westbound roadway, along the tangent portion of the bridge, in the lane next to the median. She collided with a vehicle that suddenly crossed the median from the easterly roadway. Cataldo suffered devastating personal injuries. She brought this negligence action against the New York State Thruway Authority (the Authority) based in part on its failure to place median barriers on the tangent section of the bridge.
 

 The idea of installing median barriers on the Tappan Zee Bridge is not one that had escaped study by the Authority. Its first review of this issue took place in February 1962 following the occurrence of nine crossover accidents, and several fatalities, in the time since the bridge was put into service. A staff report presented to the Authority’s Director of Traffic noted that under certain circumstances a median barrier could be a valuable safety device. The report cautioned, however, that while barriers eliminate most crossover accidents, they tend to increase other types of accidents because they often bounce
 
 *281
 
 cars back into the flow of traffic, causing rear end and "pile on” collisions when traffic is heavy in one direction. The report also raised the specter that the median would be lost as a refuge for disabled vehicles and as an access route for emergency vehicles.
 

 A second report submitted to the Director of Traffic in July 1962 by a traffic and safety engineer also questioned the overall effectiveness of median barriers on the bridge, but concluded that barriers should be installed on the west curve, which had a high concentration of crossover accidents. The recommendation with respect to the west curve was approved by the Authority chairman and the Thruway Authority Board in October 1962 and the barrier was installed.
 

 No further comprehensive study of the barrier question was undertaken until July 1972 when the Director of Traffic appointed John Manning, one of the Authority’s Traffic and Safety engineers, to report on the desirability of installing barriers on the entire length of the bridge. Manning’s report acknowledged that crossover accidents on the west curve had been virtually eliminated since installation of a barrier. The report, however, reiterated the fears expressed 10 years earlier that a barrier would increase one-way accidents involving cars that were bounced back into traffic as well as rear end collisions resulting from disabled cars that would have to remain in the traffic lanes because of the loss of the median as a refuge. The report rated the feasibility and drawbacks of several approaches, including the installation of immovable barriers on either the east curve of the bridge or the entire length of the bridge as well as the placement of movable barriers that would allow for optimum traffic control. With respect to installing an immobile barrier on the tangent section, the report was not optimistic, noting that a tow truck would probably have to be stationed permanently at one end of the bridge to ensure adequate removal of disabled cars. The. idea of movable barriers, the report stated, would probably require considerable study and expense.
 

 The Court of Claims denied the Authority’s motion to dismiss the claim, and entered judgment in claimant’s favor in the amount of $2,125,000. The court held that claimant had established the Authority’s negligence because, in its view, "had the matter been properly studied, a barrier would have been constructed on the tangent section of the bridge years before [the accident]” and the "decision not to do so * * *
 
 *282
 
 [was] not predicated upon reasonable professional engineering judgment.” The court based its holding on (1) its opinion that the Authority had overstated the value of the median mall as a factor in the safe and efficient flow of traffic on the bridge, (2) the fact that other bridges of similar character had median barriers, (3) the prevailing state of the art in highway design as it developed in the late 1960’s and early 1970’s, and (4) the continuous occurrence of crossover accidents on the bridge between 1962 and 1972.
 

 The Appellate Division reversed and dismissed the claim, holding that "[b]ecause [the Authority’s] decision not to install median barriers was premised upon a reasonable public safety plan, it may not be held liable for claimant’s injuries” (111 AD2d 144).
 

 Muller v State of New York
 

 On December 17, 1977, at 7:20 a.m., Ernest Muller was driving eastbound on the tangent section of the Tappan Zee Bridge when he collided with a vehicle that had crossed the central median from the westbound roadway. Muller and his wife brought this action against the State of New York and the Thruway Authority alleging,
 
 inter alla,
 
 the Authority’s negligent failure to install median barriers on the tangent portion of the bridge. The claim against the State was dismissed, and the Court of Claims held that the Authority was liable for Muller’s injuries. A judgment in claimants’ favor was entered in the amount of $50,500.
 

 The relevant facts for the period up until January 1973 are the same as those stated above with respect to the Cataldo claim. Thereafter, on February 28, 1973, the Manning report was reviewed by the Authority’s Traffic and Safety Committee, and the committee decided that a median barrier should be installed on the bridge’s east end. This project was completed by the spring of 1975. With respect to the tangent portion of the bridge, the committee deferred decision on the barrier question until further study could be had of the operational problems raised in the Manning report as well as safety recommendations that had been put forth in a report by Fred H. Fischer, an Authority bridge engineer. In his June 1973 report, Fischer recommended that barriers be placed on the tangent section and proposed measures to improve drainage and road surface and installation of traffic control lights on the length of the bridge.
 

 By September 1974 the Authority’s chairman and its board had agreed that median barriers should be installed on the
 
 *283
 
 entire length of the bridge. Once this decision was made the Authority undertook to study and resolve two issues: (1) the concurrent installation of a traffic control system, and (2) the location of the barrier, i.e., whether it should be built straight down the center of the median, or in a serpentine or zigzag fashion that would provide alternating breakdown bays. Three years passed between the decision to install barriers and the Muller accident.
 

 The Court of Claims finding of negligence against the Authority was based on its view (1) that in the 10 years following its initial decision not to install barriers, the Authority breached its continuous duty to review this determination, (2) that the 1972 and 1973 reports by Manning and Fischer were inadequate, and (3) that the delay between the decision in August 1974 to install barriers and the Muller accident in December 1977 was unreasonable.
 

 The Appellate Division reversed and dismissed the claim, holding that (1) the Authority could not be liable under the rule of
 
 Weiss v Fote
 
 (7 NY2d 579,
 
 supra)
 
 since it was acting pursuant to a reasonable public safety plan, (2) that any breach of the Authority’s duty to reevaluate its safety plan between 1962 and 1972 was vitiated by the experts’ recommendation in 1974 that barriers not be installed on the tangent, and (3) that the delay in installing the barrier once the decision to do so was made was not unreasonable.
 

 We now affirm the orders of the Appellate Division in
 
 Friedman
 
 and
 
 Cataldo,
 
 and reverse the order appealed from in
 
 Muller.
 

 It has long been held that a municipality " 'owe[s] to the public the absolute duty of keeping its streets in a reasonably safe condition’ ”
 
 (Weiss v Fote,
 
 7 NY2d 579, 584,
 
 supra,
 
 quoting
 
 Annino v City of Utica,
 
 276 NY 192, 196;
 
 see also, Lopes v Rostad,
 
 45 NY2d 617, 623). While this duty is nondelegable, it is measured by the courts with consideration given to the proper limits on intrusion into the municipality’s planning and decision-making functions. Thus, in the field of traffic design engineering, the State is accorded a qualified immunity from liability arising out of a highway planning decision
 
 (Alexander v Eldred,
 
 63 NY2d 460, 465-466;
 
 Weiss v Fote,
 
 7 NY2d 579, 585-586,
 
 supra).
 
 In the seminal
 
 Weiss
 
 case, we recognized that "[t]o accept a jury’s verdict as to the reasonableness and safety of a plan of governmental services and prefer it over the judgment of the governmental body which
 
 *284
 
 originally considered and passed on the matter would be to obstruct normal governmental operations and to place in inexpert hands what the Legislature has seen fit to entrust to experts” (7 NY2d, at pp 585-586,
 
 supra).
 
 The
 
 Weiss
 
 court examined a municipality’s decision to design a traffic light with a four-second interval between changing signals, and concluded that there was no indication that "due care was not exercised in the preparation of the design or that no reasonable official could have adopted it”
 
 (id.,
 
 at p 586). We went on to note that "something more than a mere choice between conflicting opinions of experts is required before the State or one of its subdivisions may be charged with a failure to discharge its duty to plan highways for the safety of the traveling public”
 
 (id.,
 
 at p 588).
 

 Under this doctrine of qualified immunity, a governmental body may be held liable when its study of a traffic condition is plainly inadequate or there is no reasonable basis for its traffic plan
 
 (Alexander v Eldred,
 
 63 NY2d 460, 466,
 
 supra
 
 [municipality’s traffic engineer’s mistaken belief that the city had no authority to place a stop sign on a private road]). Once the State is made aware of a dangerous traffic condition it must undertake reasonable study thereof with an eye toward alleviating the danger
 
 (Heffler v State of New York,
 
 96 AD2d 926, 927;
 
 Sanford v State of New York,
 
 94 AD2d 857, 859;
 
 Atkinson v City of Oneida,
 
 77 AD2d 257). Moreover, after the State implements a traffic plan it is "under a continuing duty to review its plan in the light of its actual operation”
 
 (Weiss v Fote,
 
 7 NY2d 579, 587,
 
 supra; Atkinson v City of Oneida,
 
 77 AD2d 257, 261,
 
 supra).
 

 Before analyzing the cases before us in light of these principles, it is pertinent to discuss the procedural posture in which they are presented. In
 
 Friedman v State of New York,
 
 there is an affirmed finding of fact that the State breached its duty by its unreasonable delay in acting to remedy a known dangerous highway condition once the decision to do so had been made. This finding must be upheld if supported by evidence in the record
 
 (Huntley v State of New York,
 
 62 NY2d 134, 137). In both
 
 Cataldo v New York State Thruway Auth.
 
 and
 
 Muller v State of New York,
 
 however, the intermediate appellate courts reached the factual conclusion, contrary to the respective trial courts, that the duty to the claimants was not breached.
 
 *
 
 
 *285
 
 Thus, the scope of our review is limited to determining whether the evidence of record in each of these cases more nearly comports with the trial court’s findings or with those of the Appellate Division
 
 (Matter of Nathaniel T.,
 
 67 NY2d 838;
 
 Suria v Shiffman,
 
 67 NY2d 87;
 
 Oelsner v State of New York,
 
 66 NY2d 636, 637).
 

 In
 
 Cataldo
 
 and
 
 Muller
 
 it is clear that no liability can flow from the Authority’s initial decision in 1962 not to construct median barriers on the tangent section of the bridge. This decision was consistent with the opinions that were expressed by experts in the Authority’s employ and was a rational response to valid safety concerns. The claimants argue, however, that by failing to reevaluate the barrier issue between 1962 and 1972 the Authority breached its "continuing duty to review its plan in the light of its actual operation” (Weiss
 
 v Fote,
 
 7 NY2d 579, 587,
 
 supra).
 
 They contend that this inactivity was inexcusable given the changes in the state of the art of highway design occurring during that time. While this position might have some force if urged with respect to an accident occurring during the 10-year period of inactivity, such is not the case at bar. Here, both accidents occurred after the Authority reviewed its plan in 1972 and again reached the conclusion that the public’s safety would be better served by not installing median barriers.
 

 Claimants argue, however, that the 1972 engineer’s reports upon which the Authority’s decision was made were the product of inadequate study of the issue
 
 (see, Alexander v Eldred,
 
 63 NY2d 460, 466,
 
 supra).
 
 The gravamen of this assertion is that the reports failed to consider the history of the west curve barrier since its installation in 1962 and attached inordinate importance to operational difficulties that would be incurred while downplaying safety concerns to an inappropriate degree.
 

 Strong policy considerations underpin the qualified immunity doctrine set forth in
 
 Weiss (supra),
 
 and, in cases such as these where a governmental body has invoked the expertise of qualified employees, the
 
 Weiss
 
 directive should not be lightly discounted. Appellants would have us examine the criteria that were considered by the State’s professional staff, emphasize factors allegedly overlooked, and, with the benefit of
 
 *286
 
 hindsight, rule that the studies were inadequate as a matter of law. We decline this invitation, for to do so, as the Appellate Division correctly concluded, "would constitute the type of judgment substitution that Weiss
 
 v Fote (supra)
 
 prohibits”
 
 (Muller v State of New York,
 
 108 AD2d 181, 189).
 

 Because the Authority’s decisions prior to the
 
 Cataldo
 
 accident in 1973 not to install median barriers were based on reasonable public safety considerations the Appellate Division properly dismissed the claim in that case. The Authority fulfilled its duty under
 
 Weiss
 
 by studying the dangerous condition, determining that design changes were not advisable and later reaching the same conclusion upon reevaluation of its decision.
 

 In
 
 Friedman
 
 and
 
 Muller,
 
 however, a further basis upon which the defendants may be held liable is tendered: that once a decision has been reached to go forward with a plan intended to remedy a dangerous condition, liability may result from a failure to effectuate the plan within a reasonable period of time. Although this precise question has not been specifically addressed by this court, several Appellate Division decisions have held that when the State is made aware of a dangerous highway condition and does not take action to remedy it, the State can be held liable for resulting injuries
 
 (Lattanzi v State of New York,
 
 74 AD2d 378, 379-380,
 
 affd
 
 53 NY2d 1045;
 
 Zalewski v State of New York,
 
 53 AD2d 781, 782;
 
 Stuart-Bullock v State of New York,
 
 38 AD2d 626, 627,
 
 affd
 
 33 NY2d 418). This conclusion flows logically from the premise that the State has a nondelegable duty to maintain its roads in a reasonably safe condition
 
 (Lopes v Rostad,
 
 45 NY2d 617,
 
 supra),
 
 and it applies even if the design in question complied with reasonable safety standards at the time of construction. Of course as we have said, when a municipality studies a dangerous condition and determines as part of a reasonable plan of governmental services that certain steps need not be taken, that decision may not form the basis of liability
 
 (e.g., Alexander v Eldred,
 
 63 NY2d 460,
 
 supra; Weiss v Fote,
 
 7 NY2d 579,
 
 supra).
 
 When, however, as in
 
 Friedman
 
 and
 
 Muller,
 
 analysis of a hazardous condition by the municipality results in the formulation of a remedial plan, an unjustifiable delay in implementing the plan constitutes a breach of the municipality’s duty to the public just as surely as if it had totally failed to study the known condition in the first instance.
 

 
 *287
 
 In
 
 Friedman,
 
 there is evidence to support the affirmed finding that the State unreasonably delayed its remedial action. The State failed to demonstrate at trial either that the five-year delay between DOT’S recognition of the hazardous condition on the viaduct and its project proposal and the Friedman accident was necessary in order to study and formulate a reasonable safety plan, that the delay was itself part of a considered plan of action taken on the advice of experts, or that the delay stemmed from a legitimate ordering of priorities with other projects based on the availability of funding
 
 (Puliatti v State of New York,
 
 91 AD2d 1192;
 
 see, Gutelle v City of New York,
 
 55 NY2d 794, 795;
 
 Tomassi v Town of Union,
 
 46 NY2d 91, 97).
 

 Similarly, in
 
 Muller,
 
 we conclude that the record evidence more nearly comports with the trial court’s finding that the three-year delay between the Authority’s decision in 1974 to construct median barriers and the Muller accident in 1977 was unreasonable. This is not to say that the study and resolution of issues surrounding the concurrent installation of a traffic control system and the optimum location of the barrier, the ostensible cause of the delay, was not warranted. Indeed, a reasonable delay justified by design considerations, as with one resulting from a legitimate claim of funding priorities, would not be actionable. Our review of the evidence, however, reveals that the period of consideration in this case was marked by only intermittent spurts of study and evaluation and long gaps of inactivity, wholly inconsistent with the project’s designation in an Authority press release as one having a "high priority” for which "[n]o significant delay [wa]s expected.”
 

 Specifically, a traffic control system, which would consist of electronic message signs and directional signals designed to redirect traffic in cases of lane closures, was originally proposed as part of the east curve barrier installation project. Both the Traffic and Safety Committee and the Fischer report recommended in June 1973 that such a system be installed on the entire length of the bridge. These recommendations were echoed by the Authority’s Traffic and Safety Engineer, its Director of Operations and other staff members. Thus, on September 17, 1973, the Chairman requested a firm proposal on the installation of a traffic control system together with the east curve barrier and the inclusion of funds for both projects in the 1974 budget. Thereafter, it appears that no further
 
 *288
 
 discussion of the need to install the control system took place for 21 months until a private consulting firm, Madigan-Praeger, reiterated that the system was "considered to be a very important element of the median installation.”
 

 Despite these strong recommendations and its own prior awareness of the need for a traffic control system, it was not until September 1, 1976 that the Authority finally determined that installation of the system should precede construction of the barrier, and not until January 1977 that another consulting firm, Loring & Associates, was retained to design the system. The Loring report was completed in six months, and one month thereafter the staff reached agreement on all major issues involved.
 

 With respect to the barrier location, the evidence reveals similar unexplained and unwarranted delays that likewise appear to have resulted from the failure to undertake basic substantive analysis of the issues on which the Authority’s staff disagreed. The Madigan-Praeger report, submitted nine months after the September 1974 decision to install median barriers on the tangent, discussed three possible designs — a straight barrier down the center of the median, a zigzag barrier and a straight barrier along the northern edge of the median. The report clearly reflected the view, however, that safety considerations mandated use of the centerline barrier despite the reduced operational flexibility of that location. Opposition to this recommendation was expressed immediately, and although the subject was to have been discussed again, no further expert study or discussion was undertaken for two years. Indeed, it was not until the July 19, 1977 staff and management meeting on the Loring & Associates traffic control report that the question was again raised. A second consultant, Vollmer Associates, was retained to review the Loring report and recommend a location for the barrier. The Vollmer report was received two weeks later, and on August 15, 1977 the decision was made to place the barrier down the center of the median.
 

 In light of the high priority that was placed on the barrier project, which was certainly deserved considering the hazard that the project was intended to remedy, the absence of funding limitations and the relative ease with which design and operational problems were resolved once proper analysis was undertaken, it is evident that the delay in effectuating the Authority’s plan to alleviate the dangerous condition was
 
 *289
 
 unjustified, and therefore was a breach of its duty to the public. The evidence supports the trial court’s finding that the delay was a proximate cause of Muller’s injuries. The record shows that the barrier location and traffic control questions could have been resolved within one year, and, according to both sides’ experts, the construction could have been completed within 18 months.
 

 We conclude, therefore, that the order of the Appellate Division in
 
 Cataldo
 
 should be affirmed, with costs. The order appealed from in
 
 Muller
 
 should be reversed, with costs, and the judgment of the Court of Claims reinstated. In
 
 Friedman,
 
 the order of the Appellate Division should be affirmed, with costs, and the certified question answered in the affirmative.
 

 Chief Judge Wachtler and Judges Meyer,, Simons, Kaye, Titone and Hancock, Jr., concur.
 

 In
 
 Friedman v State of New York:
 
 Order affirmed, etc.
 

 In
 
 Cataldo v New York State Thruway Auth.:
 
 Order affirmed, etc.
 

 In
 
 Muller v State of New York:
 
 Order reversed, etc.
 

 *
 

 Although the Appellate Division orders and decisions in
 
 Muller
 
 and
 
 *285
 

 Cataldo
 
 provide that the reversals are on the law alone, it is clear that the respective appellate courts reviewed the evidence and made their own factual findings.