Mashinsky v State of New York (2024 NY Slip Op 50670(U))

[*1]

Mashinsky v State of New York

2024 NY Slip Op 50670(U) [83 Misc 3d 1207(A)]

Decided on May 15, 2024

Court Of Claims

Mejias-Glover, J.

Published by New York State Law Reporting
Bureau pursuant to Judiciary Law § 431.

This opinion is uncorrected and will not be
published in the printed Official Reports.

Decided on May 15, 2024
Court of Claims

Joseph
Mashinsky, as Administrator of the Estate of SHAINDY MASHINSKY, EVA
ORDENTLICH, and SHLOMO ORDENTLICH, Claimants,

against
State of New York, Defendant.

Claim No. 130723

For Claimants:
KELNER & KELNER, ESQS.
By: Joshua D.
Kelner, Esq.
For Defendant:
LETITIA JAMES, ATTORNEY
GENERAL
By: Albert Masry, Esq.
Assistant Attorney General

Linda K. Mejias-Glover, J.

A trial on the sole issue of liability was conducted in person before this Court on
May 30, 31 and concluded on June 1, 2023. Each party called four witnesses to
testify.
The following exhibits were entered into evidence at the time of trial: Claimants'
Exhibits 1 through 13, 14A12, 15 through 18, and 20 and Defendant's Exhibits B, D, G,
M through P, and R.
On the record, the parties stipulated to the following facts:
the subject accident took place on August 24, 2016 at and/or near the
intersection of State Route 59 and Augusta Avenue, Rockland County. The involved
motorist was Sholom Lenchitz. Shaindy Mashinsky died following the accident. Joseph
Mashinsky was duly appointed as the Administrator of the Estate of Shaindy
Mashinsky.
RELEVANT TESTIMONY
Claimant's Witnesses
Eva Ordentlich
Ms. Eva Ordentlich testified that she is the
sister of the decedent (TT.[FN1]
22). She testified [*2]as to Shaindy's personality and
character (TT. 25-26). It was her testimony at the time of the incident, Shaindy was 18
years old, was planning to head to Israel for seminary (TT. 26). At the time she passed
away, Shaindy was employed working with special needs children in a public-school
setting and planned on attending college to obtain a degree in education to teach children
with special needs (Id.).
Ms. Ordentlich described Route 59, in Monsey New York, as a long road with a lot
of shopping (TT. 27). Close by, is an intersection with a crosswalk at Route 59 and Main
Street, which is used to get to one of the shopping centers (TT. 29-30). She testified that
there is another crosswalk on Remsen Avenue and Route 59, and housing developments
on each side of Route 59, which are heavily populated (TT. 30-31). Ms. Ordentlich
testified that if she was walking from her home to the shopping area, "[she] would walk
down Joshua Court down Route 59, at a little past Augusta and then cross over the
intersection and get to the shopping center" (TT. 33). She went on to testify that she
would typically crossover Route 59 at Augusta rather than crossing in the main shopping
area due to a "dilapidated auto repair shop" located at the corner of Joshua (TT. 34). 
Ms. Ordentlich testified that on the day of the accident, Mr. Shlomo Ordentlich
dropped off her and Shaindy at the shopping area around 5:30 pm so that Shaindy could
purchase some clothing for seminary (TT. 45). She and Shaindy finished shopping
between 8:20 pm and 8:30 pm and decided they were going to walk back to the
Ordentlich home because Shlomo was unable to pick them up and bring them home (TT.
46). She testified that at the time they began to walk back, it was dark outside (TT.
47).
Ms. Ordentlich went on to testify that they walked to the intersection of Main Street
and Route 59, crossed the intersection walked towards Augusta (Id.). She and
Shaindy stopped shortly before they arrived at Augusta to cross over Route 59, (TT. 48),
looked to the left then to the right to see whether there were any cars coming (TT. 49).
She testified that she saw a car off to the distance by the bend to the right in the direction
of Remsen Avenue (Id.). By observing the vehicle's headlights she determined
that it was safe to cross the road (TT. 51), but as they were crossing, Shaindy stepped
back toward the median and the coming vehicle veered into the median hitting her (TT.
52). She testified that Shaindy's "body like was catapulted" and that the "van, it like
jumped it ended up landing a little bit more ahead of [Shaindy] on Route 59"
(Id.). Shaindy was then transported to the hospital where she passed away the
next day (TT. 53-54).
On cross-examination, Ms. Ordentlich testified that she was unaware if the vehicle
could have stopped prior to hitting Shaindy. After reviewing her deposition testimony to
refresh her recollection, she testified that she believed the vehicle could have made an
abrupt, short stop, rather than veer (TT. 73-76).
Sholom Lenchitz
Sholom Lenchitz, the driver of the vehicle
that struck Shaindy, testified that on August 24, 2016, at approximately 8:40 pm, he was
driving his Toyota Sienna, with his seven-year-old son, back from a visit with his
in-laws, who resided on Dolson Road, in Monsey (TT. 93-95). He testified that he
proceeded on Remsen Avenue and then turned onto Route 59, heading in the eastbound
direction, intending to turn onto Saddle River Road (TT. 95-96). He said he was driving
the speed limit, 40 miles per hour, on Route 59 (TT. 96). When asked if he was aware
that pedestrians could sometimes cross Route 59 in the middle of the block he responded
"very subconscious" (Id.). He testified the appearance of crosswalks affects his
driving, to wit: he slows down and is careful to give attention to pedestrians (TT.
97-98).
Mr. Lenchitz testified that on the night of the accident, he observed "something in
the road" while he was coming over the hill on Route 59 (TT. 98) but did not slow down
or stop his vehicle because he did not see pedestrians and "was slow to react"
(Id.). He went on to testify that as he "came very close", he "came to focus" and
knew it wasn't possible to stop (Id.). Rather than try to stop he "turned to the left
as much as possible realizing they're crossing to the right and feeling [himself]
completely out of the actual — any actual danger (TT. 98-99), but when he
swerved to the left the corner of the passenger side of his vehicle struck Shaindy" (TT.
99).
On cross-examination, Mr. Lenchitz referred to the Department of Motor Vehicle
Hearing transcript to refresh his recollection [FN2]
 , and testified that "on that night in a vague way" he had an inclination that there
were pedestrians crossing the roadway (TT. 108-109), but as he got closer to the
pedestrians, he lost concentration and misidentified the pedestrians as objects in the road
(TT. 120). He testified that as he approached the intersection at Augusta Avenue, he saw
that there were pedestrians walking together in the roadway, the travel lane about 300
feet ahead of him. It was his testimony that his "concentration was dimmed from the
feeling that it was an open road" (TT. 113). He testified that he never applied his brakes
from time that he first thought that there were pedestrians crossing the road until the time
that he saw them in front of his vehicle (TT. 114). He testified that he made the
conscious decision to veer to the left into the median, rather than stop his vehicle (TT.
118).
Joseph Mashinsky
Rabbi Joseph Mashinsky, Shaindy's father
testified that "Shaindy was a beautiful person, a beautiful girl inside and out. She had
tremendous depth. She was an incredibly warm, loving person, a wonderful daughter,
and incredible friend, a brilliant student" (TT. 131). He confirmed that Route 59 is the
main road that runs through Monsey (TT. 133), and that prior to 2016, there were no
crosswalks between Main Street and Remsen Avenue along Route 59 and that the
distance between the two streets is "about .8, .7 of a mile," which contains a "very steep
incline" and would take approximately 20 minutes to walk (Id.). Rabbi
Mashinsky testified that after the accident, there was a crosswalk, a push button traffic
light, and pedestrian controls installed at the intersection between Route 59 and Augusta
Avenue (TT. 136).
Claimant's Expert, Nicholas Bellizzi, P.E.
Mr. Bellizzi testified as to
his education, experience and pedigree, and after a brief voir dire, he was deemed an
expert in the areas of traffic and highway design, as well as traffic engineering.
Mr. Bellizzi testified that in the field of roadway design, crosswalks are beneficial as
they delineate where pedestrians should cross and provide advanced notice to
approaching motorists that it is a location where people cross and creates an expectation
for the motorist that pedestrians are going to cross (TT. 153-154). He testified that the
purpose of a crosswalk is to change drivers' behavior, i.e., the driver will slow
down and expect or anticipate that there may be pedestrians there causing the driver to
scan for the presence of pedestrians near or approaching the crosswalk (TT. 154-155).

Over Defendant's counsel's objection, Mr. Bellizzi testified regarding the concept
"perception reaction time", which applies to motorists and is defined as "the total elapsed
time from when you first see something, observe something, to when your foot steps on
the break" [*3](TT. 159) or alternatively, is defined as
"when you first observe something and you react by steering with your hands, and that's
shorter reaction time than with your foot because your hands are already on the steering
wheel". He went on to testify that the typical perception reaction time for a motorist for
braking is 1.5 seconds under a "plain vanilla environment" (Id.), which means
that there is no inclement weather, no sight obstructions, good visibility and lighting
conditions, that the roadway is straight and level, and it is not a complex location (TT.
164). The less information to be processed leads to a shorter reaction time (TT. 164-165).
He testified that the presence of a crosswalk affects reaction time as it creates the
expectation that pedestrians may be present (TT. 166).
Mr. Bellizzi further testified that crosswalks affect pedestrian behavior as pedestrians
"would seek out a crosswalk as a location where they want to cross, [where] they're
expected to cross, rather than a location that has no crosswalk" (Id.).
Mr. Bellizzi described the various types of crosswalks, attendant warning signs,
pedestrian crossing signs located at the crosswalk (TT. 167), reflectors and signals (TT.
168). He gave testimony regarding the use and purpose of temporary signals (TT. 170).
According to Mr. Bellizzi, the signs he described are all standard signs in the Manual of
Uniform Traffic Control Devices (TT. 168). This manual, according to Mr. Bellizzi, is
the one publication that all traffic engineers in all 50 states use (Id.). 

Mr. Bellizzi testified that engineers evaluate conditions of roadways by conducting
field audits during which they identify deficiencies in safety, and then recommend
solutions. (TT. 171-172). He testified that some solutions can be implemented
immediately, some are intermediate, and some are long term (TT. 172). He explained
that, for example, paint and signs are "off the shelf" and can, therefore, be done in the
same week (Id.).
With respect to the engineering concerns presented by long stretches of roadway
between crosswalks in occupied areas, he testified that if crosswalks are too far apart
(more than a quarter mile of walking distance), pedestrians will cross mid-block to get to
their destination (TT. 172-173)
Mr. Bellizzi discussed the use and applicability of the New York State Department
of Transportation Highway Design Manual ("HDM"), which provides standards and
guidelines (TT. 173), and also directs its users to confer with publications of the
American Association of State Highway and Transportation Officials (TT. 174).
Mr. Bellizzi specifically testified that HDM chapter 18.7.1.1 specifically pertains to
pedestrian crossing distance (TT. 176). Mr. Bellizzi testified that in a suburban
residential area, such as the where the accident in this action occurred, the HDM applies,
and that the HDM indicates that a crossing "it's not to exceed a quarter of a mile" (TT.
178). He testified that the distance between Main Street where the last crosswalk was to
Augusta Avenue is 0.3 miles (TT. 180), and that the distance between the crosswalk at
Main Street and the crosswalk at Remsen Avenue is 0.6 miles, which pursuant to the
HDM is "substandard" — meaning that it is unsafe (TT. 181). He clarified that the
guidance standards are for reference, but the engineer must determine what is safe or not
(TT. 178-179).
Next, Mr. Bellizzi was referred to Exhibit 5, "Walk and Bike Assessment" (TT. 181).
He testified that a federally supported walking safety assessment study was performed
along the portion of the roadway on Route 59 from "Main Street to the east of Main
Street" and published on April 16, 2015 (TT. 183-184). He testified that it appeared that
the two segments in Rockland County, a part of it on Route 59 in Monsey and part of it
on Route 45 had been selected for study [*4]and listed as
priority investigation locations (TT. 183). He then testified that, with respect to Route 59,
the area from Main Street to the east of Main Street was examined — not in the
direction of Augusta Avenue (TT. 184). He testified that, notwithstanding the fact that
the assessment was for the area on the opposite side of Route 59 from Main Street, such
assessment is relevant as both areas (to the east and to the west of Main Street) are
similar (TT. 185-186). He testified that the assessment indicates, under "infrastructure
issues", that "few marked crosswalks existed despite clear demonstrated need for
pedestrian access to shopping centers, school, bus stops, and parking areas" (TT. 186),
which he believes to be problematic because there are "lots of pedestrian generators"
(Id.). He testified that, in his opinion, "the most important" observation made
during the assessment was that pedestrians were crossing mid-block in order to get to the
destinations — the pedestrian generators (TT. 188-189).
Mr. Bellizzi further testified regarding a conventional study conducted later in the
year of 2015, which was published in March of 2016 (TT. 189), entitled "Pedestrian
Safety Study, State Routes 59 and 45 (TT. 191, Exhibit 6). The study involved the
collection of different types of data (TT. 189). He described, in detail, the process and
protocol of a "conventional study" (TT. 189-190), and explained that the study also
included a "spot speed study" as part of this study (TT. 191). Mr. Bellizzi's attention was
drawn to several portions of the study. Notably, the study indicated that pedestrian
mid-block crossings along Route 59 were the predominant type of crossing —
exceeding crossings at intersections (TT. 194). The study further showed and that while
vehicles tended to yield to pedestrians, there were greater instances of nonyielding
observed outside of the downtown areas, such as where the accident in this case occurred
(TT. 195). Additionally, the study indicated that pedestrians were generally observed to
take the most direct route to their destination, including mid-block crossings (Id.).
Lastly, he noted that the study indicated that there were a lot of collisions on Route 59
and that the percentage involving pedestrians were high. In his opinion notwithstanding
the fact that there were no prior pedestrian accidents at the intersection of Augusta
Avenue, the need for crosswalk treatment there is not diminished (TT. 196). It was also
his testimony that that the "standard of care" for engineers is to be "proactive, not
reactive" (TT. 197). Mr. Bellizzi next testified with respect to the recommendations
contained in the published study of the placement of crosswalks on Route 59
(Id.). He testified that the study determined that 40 new crosswalks should be
striped along the three-mile stretch of Route 59 (TT. 197), and that plans were created
documenting the locations of these crosswalks (TT. 198), including one at its intersection
with Augusta Avenue (TT. 199).
Mr. Bellizzi testified that in his opinion, within reasonable engineering certainty, that
at "locations like Augusta, a crosswalk should have been placed" and that "many of those
crosswalks could be installed immediately" (TT. 200-201). He testified that it could take
a few hours to paint a crosswalk and a day to put a reflective sign, which would be an
interim improvement until the final improvement could be completed (TT. 201-202). It
was his testimony that the whole process for an interim improvement could be completed
within a few weeks (TT. 202). Mr. Bellizzi further testified that in his opinion, it would
not be appropriate for the State to fold the recommendations from the study into another
larger project that would be done a year or more later, because the team identified and
documented extensive safety deficiencies for pedestrians (TT. 202-203). He provided
further examples of temporary improvements, which could be installed until the final
could be installed (TT. 203). Finally, it was his opinion, within reasonable certainty, that
following the publication of this study in [*5]March of
2016, a crosswalk at the intersection of Augusta Ave. and Route 59 could have been
installed immediately with appropriate pedestrian crossing signage and an advanced
pedestrian crossing sign that would have all been in conformance with the Manual Of
Uniform Traffic Control Devices, and it would have been identified as a high visibility
location for pedestrians to cross (TT. 204).
Mr. Bellizzi next gave testimony in the area of accident reconstruction, including the
brake stopping distance, and gave his opinion based on his calculations as to Mr.
Lenchitz's reaction time to avoid hitting Shaindy.
On cross-examination, Mr. Bellizzi testified that there were no pedestrian accidents
at the location where the accident occurred in the three years prior to the safety study
being conducted (TT. 225). He testified that in the five years prior to the accident there
were no other pedestrian accidents nor were there complaints made by any civilians or
town officials about the lack of a crosswalk at Augusta Avenue (TT. 233). With respect
to the immediate installation of the crosswalks, Mr. Bellizzi now testified that it could
take two weeks to send out the sketch for planning purposes, get a crew to look at the
location and then order the material such as signage (TT. 239).
Mr. Bellizzi then testified that a driver should use reasonable care to avoid striking
that pedestrian when he or she sees a pedestrian in the roadway (TT. 263). Mr. Bellizzi
acknowledged that Mr. Lenchitz did not stop his vehicle, but rather veered off into the
median prior to striking Shaindy (TT. 264). He testified that even if Mr. Lenchitz had
been driving 60 miles per hour and was 400 feet away from Shaindy, he would have been
able to bring his vehicle to a complete stop before reaching her (TT. 265). He conceded
that having a crosswalk does not necessarily mean that a driver will yield to a pedestrian
in the crosswalk (TT. 267).
On re-direct, Mr. Bellizzi testified that, consistent with good and accepted standards
of roadway design, the State was required to act on its March 2016 recommendations
with respect to Augusta Avenue, even though there had not been "prior pedestrian
knockdowns at those intersections" (TT. 273). It was his testimony that the
"recommendations were implementable very fast, what we call immediate. It's not a long
term thing [that] ended up getting wrapped up into a long term thing. That wasn't
necessary and it prolonged the time to make this intersection safe" (TT. 273-274).
Deposition Transcripts
Deposition Testimony of Sandra Jobson (Exhibit
16)[FN3]
Claimants' counsel read portions of Ms. Jobson's deposition transcript testimony,
summarized as follows: Sandra Jobson has been employed by the New York State
Department of Transportation (hereinafter, the "NYSDOT") since 1993 (Exh. 16, pgs.
7-8). She testified that she received her bachelor's degree in 1992 in architecture from the
New York State Institute of Technology and her master's degree in 2003 in regional
planning from the State University of New York at Albany (Ex. 16, pg. 8). She testified
that from 1998-2000 she worked for Einhorn Yaffe Prescott (Exh. 16, pg. 9), and that in
2015, she was the regional landscape architect environmental manager overseeing the
group who supported highway improvements with [*6]landscape architecture and environmental review and
permitting (Exh. 16, pg. 14).
Ms. Jobson testified that she was the project manager for the study of Route 59,
which encompassed "the border of the Town of Ramapo with Clarkstown west to just
beyond the New York State Thruway overpass" (Exh. 16, pg. 28), and her
responsibilities included "delivering the study within the time frame that was established,
working with the budget, working with the consulting firm, putting together a project
plan and then making sure it's implemented" (Exh. 16, pg. 30). She testified that she was
advised the study was a pedestrian safety study that included Route 59 and Route 45 and
was chosen by the Town of Ramapo, based upon similar work that was conducted in the
Albany office as part of a pedestrian safety action plan (Exh. 16, pg. 32). She went on to
testify that the Pedestrian Safety action plan that commenced in 2015 and was finalized
in 2016, was a statewide study choosing 20 "focus communities" that were identified as
having higher pedestrian incident statistics (Exh. 16, pgs. 32-33, 40).
Ms. Jobson testified that the pedestrian safety study emphasized "engineering,
enforcement and education so each component of that had that responsibility." She
testified that as a team, they would access the sufficiency of the existing crosswalks (Exh.
16, pg. 44). She testified that the study recommended painting more crosswalks (Exh. 16,
pg. 44-45). Ms. Jobson testified that more crosswalks would be an improvement to
pedestrian safety based on the existing conditions, and the number of pedestrians (Exh.
16, pg. 74). She testified that "in order to improve pedestrian safety, you want to provide
pedestrians the opportunity for safe crossing and crosswalks offer that opportunity" (Exh.
16, pgs. 74-75). Ms. Jobson testified that adding new crosswalks is part of the
recommendation of creating "more of a network and more crossing opportunities for
pedestrians" (Exh. 16, pg. 83).
Ms. Jobson testified that there was a roadway study done known as the Pedestrian
Safety Action Plan and the Walk and Bike Assessment which consisted of studies of
Routes 59 and 45 in Rockland County (Exh. 16, pg. 52). She testified that the team
provided recommendations after conducting the Walk and Bike Assessment of Route 59
for pedestrians (Exh. 16, pg. 54). She went on to testify that there was a search of the
New York State Department of Transportation Accident Location Information conducted
from April 1, 2012, through March 31, 2015, which showed that there were 716 total
crashes, 26 involving a pedestrian on Route 59 (Exh. 16, pgs. 71-72). She defined the
term "traffic calming" as encouragement to drivers to drive slower or "at least the speed
limit" (Exh. 16, pg. 83). Ms. Jobson testified that the NYSDOT is responsible for
striping new crosswalks, at an approximate cost of $150,000 (Exh. 16, pg. 84).
In rebuttal, Defendant's counsel read portions of Ms. Jobson's deposition
transcript testimony, summarized as follows: Ms. Jobson testified that it is the
regional traffic and safety group's responsibility to oversee the safety of the roadways
(Exh. 16, pg. 17). She testified that when the Walk and Bike Assessment of Route 59 for
pedestrians' study was commenced there was a "Route 59 Lower Hudson Transit Link
Project (hereinafter "LHTL") that was ongoing and they were going to be making transit
improvements" which would be an opportunity to "make pedestrian improvements in that
project" (Exh. 16, pg. 59). After the study was completed, Ms. Jobson "handed off" the
study to Mark Tiano, the project manager of "the Route 59 Transit Sidewalk
Improvements Project" to facilitate implementation of the recommendations (Exh. 16,
pg. 92-93).
[*7]Deposition Testimony of Adam Levine,
PE (Exhibit 17)[FN4]
Claimant's counsel read portions of Mr. Levine's deposition transcript
summarized as follows: Adam Levine, PE testified that he is employed by the
NYSDOT (Exh. 17, pgs. 7-8), and that in May of 2016, he became the Acting Regional
Traffic Engineer for the Hudson Valley Office, Region 8, which is located in
Poughkeepsie (Exh. 17, pgs. 23-24).
He testified that if Region 8 wanted to place a new crosswalk "it could have been
either through the traffic group doing one of these traffic studies or the design group
doing a capital project or somebody observing it and observing a location and getting
back to us" (Exh. 17, pg. 99). He went on to testify that a study would have been done
prior to placing a crosswalk "to determine whether a crosswalk was an appropriate
treatment for that particular location" (Exh. 17, pg. 100). "An analysis would have to be
done whether a traffic signal is warranted in a location. If a traffic signal is warranted and
the department in the region decides to install one, then funding needs to be identified
because the traffic signal typically in the Hudson Valley costs about [$]250,000 to install.
So that funding would need to be identified and someone would need to design the
signal" (Exh. 17, pgs. 100-101). Mr. Levine testified that this would fall within the
design group, which is typically a long process and would typically be included in
another capital project nearby as that is the most efficient method (Exh. 17, pg. 101). He
testified that the painting of the actual crosswalk could be completed in a day (Exh. 17,
pg. 100).
In rebuttal, Defendant's counsel read portions of Mr. Levine's deposition
transcript testimony, summarized as follows: Mr. Levine received his bachelor's
degree in civil engineering from Princeton University in 1988 and his master's degree
from Polytechnic University in transportation planning and engineering in 2000 (Exh.
17, pgs. 8-9). He testified that in 1995 he became a professional engineer in the State of
New York and in 1989 he became employed by the State of New York (Exh. 17, pgs.
11-12). His first assignment with the NYSDOT, was from 1989-2002, with the Region
10 Long Island Office (Exh. 17, pg. 13). He testified that in or around 2013, he took a
position as the manager of the Hudson Valley transportation management center in
Hawthorne, New York (Exh. 17, pg. 22). He explained that the management center is a
facility used to "monitor the roadway using closed circuit television cameras and to post
electronic messages on message signs that are over the highways and roadways in the
seven counties of the Hudson Valley" (Id.).
Mr. Levine testified that in 2016, there were approximately six to seven people in the
safety group. He testified that one group worked on the highway safety improvement
program and another group responded to requests for safety studies (Exh. 17, pg. 56).
The highway safety improvement group received an annual list from the Albany office
containing the locations in Region 8 with the most crashes for the year. The expectation
was that using the services of a consulting firm, the group would "analyze approximately
20 percent of those crashes each year or those locations each year" (Id.). The
annual list formally known as Priority Investigation Location List ("PILL"), would
contain approximately 50 locations, 10 of which would be selected for further analysis
based upon whether those locations had previously been studied and whether an activity
was planned in the capital program to make improvement in those locations [*8](Exh. 17, pgs. 57-58).
Mr. Levine testified that the safety group does not address the locations in response
to their inclusion on the PILL list, but rather "would receive approximately 200 letters
annually from citizens or elected officials requesting traffic studies either at intersections
or sections of roadways and they were assigned to this team to analyze" (Exh. 17, pg.
61). He testified that the team would initiate studies of areas if a staff member noticed
there was an issue with a specific location and could raise it to a team member
(Id.). He testified that an additional way for a location to be the subject of a safety
study is by emails from the transportation management center to be sent out to "catch the
attention of the regional director or the regional traffic engineer or anyone who might say
that that might be a location that could be looked at" (Exh. 17, pg. 64). Mr. Levine
further testified that the placement of a pedestrian crosswalk "in the middle of nowhere"
would not necessarily calm traffic (Exh. 17, pg. 78).
Defendant's Witnesses
Sandra Jobson
Ms. Jobson
put her pedigree information and employment history on the record. She testified that in
2015, her title was regional landscape architecture environmental manager, but she was
assigned to be the project manager for the pedestrian safety plan involving Route 59,
overseeing the day-to-day developments (TT. 282). She testified that the State hired an
outside engineering firm, VHB, for the study, and put together a "study advisory
committee" consisting of law enforcement, NYSDOT personnel, and local municipal
representatives (TT. 283, 285). She went on to testify that the study had to be completed
in a very short period of time because "we had a follow up project in that particular
corridor, Route 59, called the [LHTL], which was going to enhance transit. So, the
thought was that our study could look at pedestrian safety and circulation in the corridor
and that what came out of our study then could be implemented as part of the larger
project" (TT. 283, 284).
Ms. Jobson testified that VHB drafted the report, which contained recommendations,
though not detailed recommendations for implementation, but that her group had a
generalized implementation plan. She testified that it took about 12 months to take the
conceptual plan that VHB drafted, to do scoping and preliminary design, and another 12
months for final design (TT. 291-293). After a final design was created, it went out "for a
competitive bid," which took approximately 3 months, and then another 3 months for the
State to clear the apparent low bidder and then the contractor could obtain materials and
mobilize to the cites and get the necessary permits (TT. 294-295).
Ms. Jobson testified that Mark Tiano was the project manager of the LHTL (TT.
297). She testified that when she finished the study, she took the recommendations and
sent the study to Mr. Tiano's group (Id.). Mr. Tiano's group then took that
"concept plan" "and they go much deeper into each of those locations within that
corridor to determine" whether "pedestrian signal poles at this location" needed to be
added or updated. Next, the team "look[ed] at the grading and how to put the new
sidewalks in, where the crosswalks would line up with the new sidewalks" (TT.
297-298). However, she conceded that the State had the capability to make
improvements and modifications to roadways without the need to wait for the
recommendations to merge into large projects for funding (TT. 308).
On cross-examination, Ms. Jobson testified that the "rule of thumb" is that
crosswalks should not be more than 1,000 feet apart in populated areas (TT. 320). She
testified it was not the intent of the study to implement the crosswalks recommended in
April, right after the study was [*9]published, which was
contradictory to what she testified during her deposition (TT. 322-323). She testified that
her memory would have been better when she gave her deposition testimony than at trial
(TT. 322-324).
On re-direct examination, she testified that the accident study is conducted by
looking over a three-year period, which at the location in which the accident occurred
there had not been any incidents with pedestrians (TT. 331). She testified that the study
was a "planning level study" that could be handed to the LHTL project to be fully vetted
and engineered prior to going into construction (TT. 333). 
Sergeant Sean Lee
Sergeant Lee testified that he was been
employed with Town of Ramapo Police Department since June 2000 (TT. 342). He
testified that he was the first to arrive on scene after the accident and testified that there
was a damaged vehicle and a female victim being treated (TT. 346). He testified that the
distance between where Mr. Lenchitz described "seeing something in the road" to the
accident location was measured to be approximately 450 feet (TT. 353). He testified that
the "pedestrians out in the roadway have the right of way and the driver of the vehicle
should have yield[ed] to those pedestrians" (TT. 358).
Mark Tiano
Mark Tiano testified that he has been employed by
the NYSDOT for 23 years, and that he is currently the regional design engineer for
Region 8 in the Hudson Valley (TT. 364). He put his pedigree and employment history
on the record. He testified that in 2015 and 2016, he was the NYSDOT Region 8 design
group and became aware of the Lower Hudson Transit Link ("LHTL") Project, which is
"a bus rapid transit project that has a service that brings people from Westchester County
to Rockland County, and in the reverse, it involves implementation of many traffic signal
control options to give bus priorities through the corridor that it's traveling along,
integrated bus stops, camera detection, video detection, message boards, and also
upgraded pedestrian facilities to get to and from bus stops and along the route including
sidewalks, crosswalks, things like that" (TT. 366-367). His role in the project was to
coordinate/oversee the design approval process and the actual plan production process
(TT. 367).
Mr. Tiano testified that the NYSDOT hired an engineering firm, Arup, to coordinate
the design plans for the LHTL Project (TT. 368). He testified that the plan indicated that
a sidewalk and three crosswalks were to be added along Route 59, one specifically across
Augusta Avenue as an intersection rather than a "mid-block" crossing (TT. 373). He
went on to testify that he would take a study such as this and look at the different aspects
rather than just going out and striping crosswalks (TT. 374-375). He explained that he
would consider the proximity of the intersection, whether a traffic control device is at the
intersection, as well as whether there are existing sidewalks that permit crossing (TT.
375). Mr. Tiano testified that he provided the study plans to Arup to develop a
conceptual design plan for the intersection of Route 59 and Main Street (TT. 376). He
testified that Arups' preliminary design plans showed a recommendation for a rapid
rectangular flashing beacon pedestrian signal to be installed along with striped crosswalk
and curb ramps at the intersection (TT. 377).
Mr. Tiano testified that once Arup completed the design plans, they were reviewed
internally within the design group and externally amongst all different groups in the
department, which consisted of real estate groups, construction groups, survey groups,
Traffic and Safety Group and maintenance groups (TT. 379). He testified that Joseph
Hurley from the Traffic and Safety Group sent him an email dated November 16, 2017,
discussing his group's concerns with [*10]the initial plan
including the Augusta Avenue intersection (TT. 383). He testified that these comments
were sent directly back to Arup, who redrafted the plans based upon the comments and
discussion (TT. 380-382). Arup's re-drafted plan added installing a high intensity
activated crosswalk ("HAWK") system (TT. 383). He went on to testify that the HAWK
system has three-color lights similar to a traffic light, designated for pedestrian crossings
(TT. 385). If the pedestrian pushes the button, the light will go orange and then red, to
allow the pedestrian to cross the street (Id.).
Mr. Tiano testified that as of the date of his testimony, there was a HAWK system
installed in each direction of travel placed on either side of the crosswalk and at a
distance from the intersection of Augusta Avenue and Route 59, and that "the crosswalk
is off the intersection" (Id.). He explained that this is typically installed this way
to "if a car pulls out of Augusta and takes a left, they would then have time to see the
crosswalk, see the HAWK signal there to stop them prior to the crosswalk" (TT. 386). He
testified that when a study is done and a recommendation is made, such as to install a
HAWK system, he would not recommend immediately painting a crosswalk while
waiting for the HAWK system to implemented (TT. 387), because a crosswalk must be
placed at the correct location with the appropriate measures being taken to allow a
pedestrian to cross safely (TT. 388). He explained the possible negative outcomes if a
crosswalk is "striped" without taking into consideration other factors, including the
installation of an ADA compliant ramp (TT. 388). He further testified that there were
recommendations in the study, which were not implemented by DOT (TT. 391).
On cross-examination, Mr. Tiano testified that with respect to the deadlines and
timelines for work on projects, each project is put on a program and given a letting date
[FN5]
(TT. 399). He testified that for a larger project a typical letting date varies, but it could be
a year or two, or more (TT. 400).
He testified that after received the study, he sent it Arup, the design consultant, to be
further evaluated (TT. 402), but he did not give them a deadline to "turn things around
for Route 59", because it was part of the bigger, overall project (TT. 404). The plan that
was received back from Arup was dated October 23, 2017 (TT. 416).
Mr. Tiano agreed that both the original plan and the end plan from Arup indicated
that a crosswalk with a signal should be placed at the intersection of Augusta Avenue
and Route 59, with the one main difference being the type of signal to be installed (TT.
422-423). Mr. Tiano testified that there was a temporary traffic signal at the site of the
location, however, there is nothing in the record indicating the date it was installed (TT.
413).
Mr. Tiano testified that he was not aware of any priority investigations for Augusta
Avenue and Route 59 that involved pedestrians getting injured (TT. 386).
On re-direct, Mr. Tiano explained that once he receives plans, they must go through
the design approval process before any project can be initiated (TT. 425-426). Mr. Tiano
further explained that based upon the timing of the plan reviews and getting approvals
and then implementing the process, plus procuring the signage poles, a crosswalk could
not have been implemented by August 2016 (TT. 427).
Patrick Sbano
Defendant's expert, Patrick Sbano testified he is
a civil engineer licensed in the State of New York since August 1996 (TT. 439). He
testified that he is currently employed as the Director of Traffic Engineering for the City
of New Rochelle and has been for approximately seven years (Id.). He testified
that he reviewed the data from the five-year period prior to the accident for the
intersection of Augusta Avenue and Route 59, which indicated that there was one prior
accident involving a pedestrian. Based upon his review of this data, it was his opinion
that the data did not reveal a dangerous condition at the site nor that it posed a dangerous
condition for pedestrians crossing the road as of August 24, 2016 (TT. 442—443,
448). He explained to the Court the benefits and purposes of a crosswalk are to alert
motorists to the possible presence of pedestrians, "helps to channelize pedestrians to an
area where there may be more favorable conditions to cross" (TT. 443).
Mr. Sbano further testified that, after reviewing the plan for Augusta Avenue and
Route 59, it was his opinion that without additional enhancements such as signs,
beacons, or a HAWK system, simply striping a crosswalk would not be good engineering
practice (TT. 451). He testified that even if NYSDOT determined to install a HAWK
system at the site in August 2015, it could not have been completed by August 2016 (TT.
456). He went on to testify that in order to be compliant with the American Disabilities
Act ("ADA") and install the curb cuts for ramps in the sidewalk at August Avenue, it
would take approximately one year to conduct a survey, create design plans, and put out
bids for construction (TT. 458). Mr. Sbano opined that the absence or presence of a
crosswalk would not have prevented the accident in this case, because the motorist saw
the pedestrians. The point of the crosswalk is to alert motorists to the possible presence
of pedestrians so if the motorist has already seen the pedestrian, there is no additional
benefit to having a crosswalk (TT. 463).
On cross-examination, Mr. Sbano testified that as a roadway engineer, it is his job to
assess a roadway in light of its ongoing use and operation and not wait for accidents to
happen to do so (TT. 473). He testified that he did not rely on the HDM when opining on
his cases (TT. 476). He testified that if there are not enough crosswalks in an area given
the pedestrian traffic, the likelihood of mid-block crossings will increase (TT. 477). 

 LAW AND ANALYSIS
The facts of this case are tragic; and the Court truly sympathizes with Shaindy's
family, friends, and community. The Court is tasked with determining, based upon a
careful review of the testimony of the witnesses and exhibits in evidence whether a
dangerous condition existed and that the State has breached its duty to alleviate a known
hazardous highway condition, to wit: whether the State's failure/delay to install a
pedestrian crosswalk at the intersection of Augusta Avenue and Route 59 in Monsey,
New York was the proximate cause of Shaindy's untimely death.

Application of the Doctrine of Qualified Immunity
It is well-settled that the State of New York has the absolute duty to maintain its
roadways in a reasonably safe condition (Friedman v State of New York, 67
NY2d 271, 283 [1986]), however, the State is not an insurer of the safety of its roadways,
and the mere fact that an accident resulting in injury occurred does not render the State
liable (Tomassi v Town of Union, 46 NY2d 91 [1978]). 
"While [the State's] duty is nondelegable, it is measured by the courts with
consideration [*11]given to the proper limits on intrusion
into the municipality's planning and decision-making functions [and] in the field of
traffic design engineering, the State is accorded a qualified immunity from liability
arising out of a highway planning decision" (Friedman v State of New York, 67
NY2d 271, 283, see also, Alexander v Eldred, 63 NY2d 460, 465-466 [1984];
Weiss v Fote, 7 NY2d 579, 585-586 [1960]).
Applying the doctrine of qualified immunity, the State may be held liable when it is
evident that its study of a traffic condition is "plainly inadequate or there is no reasonable
basis for its traffic plan" (Friedman v State of New York, 67 NY2d at 283;
citing, Alexander v Eldred, 63 NY2d 460, 465-466 [1984]; see also, Weiss v
Fote, 7 NY2d 579, 589 [1960]). Here, there is no credible evidence or testimony
indicating that either of the two studies conducted were insufficient or inadequate.
Next, "[o]nce the State is made aware of a dangerous traffic condition it must
undertake a reasonable study with an eye toward alleviating the danger" (Friedman v
State of New York, 67 NY2d 271, 284; citing, Heffler v State of New York,
96 AD2d 926, 927 [2d Dept 1983]). Thereafter, upon implementing a traffic plan to
alleviate such dangerous condition, "it is under a continuing duty to review its plan in
light of its actual operation" (Friedman v State of New York, 67 NY2d 271,
284; citing, Weiss v Fote, 7 NY2d 579, 587, supra]). Furthermore, once a
decision has been reached to go forward with a plan designed to remedy a dangerous
condition, liability may flow from a failure to effectuate the plan within a reasonable time
period (Friedman v State of New York, 67 NY2d 271, 286).
In analyzing the facts of this case, the Court must first determine that a dangerous
condition existed at the situs of the accident, and if so, did the State have actual or
constructive knowledge of such dangerous condition. If the Court determines these two
questions in the affirmative, it is for the Court to determine if the State's delay in
remedying such dangerous condition constitutes a breach of its duty owed to Claimants
and if such breach was the proximate cause of the accident, which resulted in the death
of young Shaindy. Only if all of the foregoing is decided in the affirmative can the State
be held liable.

Whether a Dangerous Condition Existed
Here, the State completed two studies of the area surrounding and including the situs
of the fatal accident — the Walk and Bike Assessment followed by the Pedestrian
Safety Study. The record is clear that the NYSDOT Pedestrian Safety Study was not
conducted in response to reports of pedestrian crash data at the specific situs of the
accident, but rather "[a]s a consequence of the Walk and Bike Assessment and
knowledge of other safety deficiencies in the corridors," and it was "initiated to further
identify specific recommendations that could be implemented to help improve pedestrian
safety along Route 59 with an emphasis on engineering, education and enforcement"
(Exh. 6, page 5). Moreover, the studies did not reveal that there had been any pedestrian
crashes involving motor vehicles at the intersection of Augusta Avenue and Route 59
during the period of April 1, 2012 through March 15, 2015 (see Exh. 6, pages 284, 286).
The studies did, however, reveal a high incidence of mid-block crossing at this
intersection. The Court cannot find anything in the record to demonstrate that at the time
the report of the Pedestrian Safety Study was issued, the intersection of Augusta Avenue
and Route 59 had been designated or identified as a dangerous condition. The lack of
prior similar accidents is an indication that the roadway is reasonably safe for those who
exercise reasonable care (Terrazas v State of New York, UID No. 2011-018-222,
[Fitzpatrick, J. June 30, 2011]; Dahl v State of New York, 13 Misc 3d 590 [Ct Cl 2006]
affd 45 AD3d 803; Fowle v State of New York, [*12]187 AD2d 698 [2d Dept 1992]).

Whether the State Breached Its Duty
The Court finds that Claimants did not demonstrate a breach of the State's duty to
correct a dangerous condition, even if one existed. The Court is satisfied that the
projected time to complete the installation of the crosswalk, along with all the attendant
safety equipment, at the intersection at issue was not unreasonable. Though the
Pedestrian Safety Study defined the implementation period for the striping of new
crosswalks, as well as installing traffic and pedestrian signal equipment as "short" (see
Exh. 6, page 38), the credible testimony satisfactorily demonstrates that the process and
review the State determined was required to implement such an installation plan was
appropriate, in light of the absence of any evidence of past pedestrian crashes, injuries or
fatalities at the specific site of the accident in this case (see Exh. 6, page 286). 

 Whether the Absence of a Pedestrian Crosswalk Was the Proximate
Cause of the Accident
Assuming arguendo, this Court would have determined that a dangerous
condition existed at the intersection of Augusta Avenue and Route 59, and that the
State's delay in striping a cross walk there was unreasonable, the Claimants failed to
satisfactorily demonstrate that the State's delay was the proximate cause of the accident
and, consequently, Shaindy's death (See, eg., Sheehan v City of New York, 40
NY2d 496, 501 [1976] ["Evidence of negligence is not enough by itself to establish
liability. It must also be proved that the negligence was the cause of the event which
produced the harm sustained by one who brings the complaint."], citing, Saugerties
Bank v Delaware & Hudson Co., 236 NY 425 [1923]; see also, Donaghy v
Bilotti, 159 AD2d 478 [2d Dept 1990], appeal denied, 76 NY2d 702
[1990]).

 Mr. Lenchitz's Failure To Brake Was The Proximate Cause Of The
Accident
Every motorist is bound to use his senses to see what is before him (Robinson v
State of New York, 38 Misc 2d 229, 234 [Ct Cl 1962], affd, 19 AD2d 946
[3d Dept 1963], appeal denied, 14 NY2d 484 [1964]). Significantly, Mr.
Lenchitz testified that he was familiar with the accident site as a resident of Monsey. He
further testified that just prior to the accident, he was traveling at a speed of
approximately forty miles per hour when he observed "something" "vaguely"
approximately 450 feet away. It was his clear testimony that he swerved into the median
to avoid collision with what he saw in the road rather than stop to avoid any
collision.
In light of the foregoing, it is this Court's determination that there is no basis for
finding that the absence of those markings, signs, speed control devices and design
details caused Mr. Lenchitz to do anything different than he would have done had they
been present (see, Feeney v
Holeman, 73 AD3d 848, 849 [2d Dept 2010] [summary judgment awarded to
town; absence of warning signs or strobe light at intersection could not be a proximate
cause of the accident where offending driver was familiar with the intersection where the
accident occurred]; Gilberto v Town of Plattekill, 279 AD2d 863, 864 [3d Dept
2001] [town awarded summary judgment; absence of warning sign or other traffic
control device or markings may be excluded as a cause of the accident if the offending
driver's awareness of the conditions prescribed the same course of action as the warning
sign would have or if the driver, due to familiarity with location, actually had the danger
in mind upon approach to the location]).
This Court is thoroughly convinced that Mr. Lenchitz's decision to swerve rather
than brake to avoid collision when he saw "something" in the road was the proximate
cause of the accident and that there was no causal connection between any inaction,
failure or negligence on the part of the State and Shaindy's death (see, Shaw v State
of New York, 196 Misc 792 [Ct Cl [*13]1949]). Had
he taken the appropriate action to avoid collision, there would have been no accident
(see, Tomassi v Town of Union, 46 NY2d 91 [1978]).

Decision
There can be no question that the loss of young Shaindy's life is a great tragedy. Her
loss saddens this Court as it does, no doubt, sadden and continue to devastate her family,
friends and community. It is with a heavy heart that this Court must find the State is not
liable for her loss and Claim 130723bis hereby dismissed. Having carefully reviewed the
credible testimony and evidence, it is clear that the State did not breach its duty and that
the absence of the crosswalk was not the proximate cause of the action. It is this Court's
finding that the proximate cause of the accident was Mr. Lenchitz's negligence and
carelessness, and the fault for the loss of Shaindy's life falls squarely on the shoulders of
Mr. Lenchitz.
Any and all motions not previously decided are denied.
Let Judgment Enter.
Dated: May 15, 2024
Hauppauge, New York
___________________________
LINDA K. MEJIAS-GLOVER,
Judge of
the Court of Claims

Footnotes

Footnote 1:Trial Transcript. 

Footnote 2:Marked for
identification as Exhibit H, but not entered into evidence.

Footnote 3:Upon consent of both
counsel, Claimants sought to read portions of Ms. Jobson's deposition testimony in its
case-in-chief rather than calling her as a witness and Defendant read portions in rebuttal.
Notwithstanding the foregoing, Defendant called her to testify in person.

Footnote 4:Upon consent of both
counsel, the parties agreed to certain readings of Mr. Levine's case-in-chief and rebuttal
readings. 

Footnote 5:Mr. Tiano stated that the
"letting date" is when a contract for a project is advertised and opened for bids.